In re LAPTOPS ETC. CORPORATION, Debtor.

LAPTOPS ETC. CORPORATION, et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA, Defendant.

Bankruptcy No. 90–54319–SD.
Adv. No. 92–5473–SD.

United States Bankruptcy Court,
D. Maryland.

Dec. 20, 1993.

Howard A. Rubenstein, John A. Carlton, Adelberg, Rudow, Dorf, Hendler & Sameth, Baltimore, MD,. for debtor/plaintiffs.

Nancy Smith, Asst. Corp. Counsel, DC, Washington, DC, for defendant.

## MEMORANDUM & ORDER DISALLOWING THE PREPETITION PRIORITY AND POSTPETITION ADMINISTRATIVE TAX CLAIMS OF THE DISTRICT OF COLUMBIA & GRANTING JUDGMENT IN FAVOR OF THE PLAINTIFFS

WILLIAM A. HILL, Bankruptcy Judge, Sitting by Special Designation.

The plaintiff-debtor, Laptops Etc. Corporation (Laptops), and Edward Dow (Dow) commenced the above-entitled adversary proceeding by complaint filed on October 6, 1992, in order to appeal the assessment of "sales" and franchise income taxes together with penalties and interest by the District of Columbia Department of Finance and Revenue (Department). Laptops, by amended ob-

jection filed on October 28, 1992, further seeks the disallowance of the prepetition priority and postpetition administrative tax claims (tax claims) filed by the District of Columbia in the amounts of $85,593.99 and $39,811.15 respectively.

Both the aforementioned complaint and amended objection challenge the legal and factual basis for the tax assessment and concomitant tax claims. On October 5 and 6, 1993, a consolidated trial was held before the undersigned judge sitting by special designation on the merits of both the complaint and amended objection. From the evidence presented and arguments made, the court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

Laptops Etc. Corporation is a Virginia Corporation with its principal place of business located at 305 York Road, Towson, Maryland. Laptops has a secondary place of business located at 98 North Washington Street, Falls Church, Virginia. The debtor has operated a retail establishment selling laptop computers through its Falls Church, Virginia location since 1988. Although retail sales encompassed the primary source of revenue for the Virginia outlet, Laptops also engaged in some computer leasing and repair through this facility. Edward Dow, a Virginia domiciliary, is the president and sole stockholder of Laptops.

The debtor has never had any subsidiaries or affiliated companies, offices, outlets, storage facilities, or registered agents within the District of Columbia. It never owned any tangible property, real or personal, in the District of Columbia or did it ever store any stock of goods therein. Nor did the debtor engage employees to actively solicit business within the jurisdiction. Presumably, the debtor was not licensed to do business within the District of Columbia, although no direct evidence was presented on this point.

Due to the geographic proximity of the Virginia retail store to the District of Columbia and the extensive circulation of the periodical, the debtor occasionally advertised in the Washington Post Newspaper. Additionally, the debtor maintained an advertisement in the District of Columbia Yellow Pages for a period of time but withdrew the advertisement in early 1990 due to the costs involved and the debtor's view that it was not having an impact on sales.

Sales or lease transactions of laptop computers from the Virginia retail outlet were typically effectuated in one of the following three ways: (1) a customer would patronize the Virginia retail establishment, purchase or lease a computer(s), and then personally take the purchased or leased computer(s) with him or her after payment of the purchase price or rental fee which included an assessment of a Virginia sales tax; (2) a customer would patronize the Virginia retail establishment, purchase or contract to purchase a computer(s), and then that computer(s) would be shipped tax free to that customer by common carrier; or (3) the customer would mail or fax a purchase order(s) to the Virginia store and the computer(s) would be shipped tax free after acceptance at the Virginia location to the customer by common carrier. Repair transactions were accomplished by the customer returning the item to the Virginia store for servicing either personally or by the mails and subsequently returning to the facility to retrieve the computer or having it shipped by common carrier to his or her location. In all instances, the sold or leased merchandise or parts utilized in connection with repairs were not located in the District of Columbia at the time the agreements for sale, lease, or repair were reached. At the time the sales, lease, or repair agreements were reached, the merchandise or parts subject to the contract were physically located at the Virginia retail store, warehoused at the Maryland outlet, or a part of the general inventory of a manufacturer or supplier located outside the District of Columbia.[1]

With the limited exception of government contracts which usually prohibited the impo-

---

1. None of the suppliers or manufacturers that were utilized by the debtor were located within the District of Columbia.

sition or assessment of shipping charges related to the purchased or leased items, the purchaser or lessee of the merchandise paid the shipping costs associated with all goods delivered by common carrier to the buyer's or lessee's location. The risk of loss for the merchandise shipped by common carrier, however, fell upon the debtor until the purchased or leased merchandise reached the buyer's or lessee's location. Consequently, the debtor maintained an insurance policy to cover the goods in transit. Additionally, the contracts for sale on all goods shipped by common carrier into the District of Columbia were via F.O.B. place of destination.

Although the District of Columbia Department of Finance and Revenue attempted to establish that agents of the debtor frequently delivered merchandise by their own vehicles and actively assisted in the installation of computer hardware and software, the greater weight of the evidence was inapposite to the Department's position. Contrary to the department's assertions, the testimony established that the virtually all interstate deliveries were effectuated by common carrier and that this was indeed company policy since the debtor's insurance policy would only cover those goods in transit if shipped by common carrier. It was only under rare circumstances, for instance when a component or computer was missing from an order and an agent was in the area or when time was of the essence, that an interstate delivery was effectuated by the debtor's personnel in the District of Columbia. Again, these instances were isolated and were rare exceptions to the manner in which interstate deliveries were effectuated.[2]

It was readily acknowledged, however, that with respect to a large contract with the United States Department of Labor and possibly several other accounts that an agent for the debtor accompanied the common carrier in his own vehicle on a number of occasions to the customer's location in the District of Columbia. This was done incident to the sale predominantly for customer relations purposes as well as to ensure that certain computers were delivered to specific offices within a multi-officed building. Since the debtor's primary business activity was the sale of laptop computers, no installation of the sold or leased merchandise was a necessary incident to the sale or lease of the computers. On rare occasions, the debtor would demonstrate the basic operation of the computer. Again, these instances were isolated as the sold merchandise was quite simplistic in terms of operation.

Due to reasons not germane to the issue at hand, the debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 9, 1990, in the District of Maryland. During a postpetition period from February 21 to April 8, 1992, the Department conducted a routine audit of the debtor. The audit covered a review of all sales, lease, and repair transactions from 1987 through February 1992. As a direct result of the audit, the Department issued a Notice of Jeopardy Assessment on April 9, 1992, for unpaid corporation and sales taxes in the amount of $1,063,637.00. Since the debtor did not collect sales or use taxes from any of the identified interstate sales and challenged the propriety of the aforementioned assessment, the debtor did not remit any moneys toward the payment thereof. Following the Jeopardy Assessment, the Department filed a Notice of District Tax Lien for Corporation Income Taxes and Sales and Use Taxes (tax lien) on August 26, 1992, against both the debtor and Dow personally in the amount of $1,096,372.17 stemming from unpaid taxes which the debtor ostensibly owed the District of Columbia. Pursuant to the Federal Rules of Bankruptcy Procedure, the debtor filed a proof of claim on behalf of the Department on September 8, 1992, and listed the amount set forth in the tax lien as a priority claim in the amount of $1,096,372.17. On the basis of a tax return subsequently submitted by the debtor, the Department filed amended prepetition priority and postpetition administrative tax claims in the amounts of $85,593.99 and $39,811.15

---

2. Payment for all sales were remitted directly to the debtor in Virginia. The Department made no averment in this case which intimated that payment for any of the interstate sales transactions were ever remitted to an agent of the debtor in the District of Columbia.

respectively.[3] (*See* Plaintiffs' Exhibits 5 & 6).

The aforementioned tax claims emanated from an assessment on interstate sales and income generated from the debtor's location in Virginia. The Department, through a singular auditing agent, merely went through purchase orders or invoices maintained by the debtor during the course of the audit and ascertained those sales, lease, or repair transactions in which the invoice or purchase order specified a District of Columbia address. From those purchase orders or invoices which indicated that goods sold or leased in Virginia were ostensibly delivered to the customer in the District of Columbia, the auditing agent created a worksheet which specified the invoice number, the customer's name, address, nature and item of sale, and amount of sale. A "sales" tax was assessed and calculated by multiplying a six-percent tax rate on the retail amount of all goods sold to District of Columbia customers over the course of the years that were subject to the audit.[4] Only where it was "clear" that a District of Columbia customer actually picked up the merchandise in Virginia would the auditing agent exclude a transaction with a District of Columbia customer from the pool of sales subject to the tax assessment. Moreover, any ambiguity in this regard was resolved in favor of finding the transaction to be subject to the District of Columbia sales tax.[5] An assessment was made on virtually all sales transactions in which the invoice specified a District of Columbia customer irrespective of whether a Virginia sales tax had already been collected from the District of Columbia customer and remitted to the Virginia taxing authority.[6] Even sales to some ostensibly exempt governmental agencies such as the Department of Commerce were included in the pool of invoices or purchase orders that were considered by the auditing agent to be taxable transactions since the sale was not evidenced by an "official" purchase order.

In subsequently reviewing the transactions identified by the Department in the aforementioned worksheet of taxed transactions, Dow was unable, after considerable effort, to identify a great number of the transactions because the invoice numbers and information related thereto in the Department's worksheet did not correctly correspond with the invoice numbers, customer names, and purchase amounts via the debtor's records. Moreover, Dow's uncontroverted testimony established that of the invoices in which he was able to properly identify and correspond from the debtor's records to the Department's worksheet, there were approximately two hundred and fifty (250) mistakes in names, dates, invoice numbers, etc. in the worksheet utilized by the Department as a basis for taxation.

3. Included in the above referenced priority and administrative tax claims are comparatively nominal amounts for corporate franchise income taxes and amounts for interest and penalties in the aggregate amount of $752.50 ($460.50 representing the prepetition corporate franchise income tax due plus interest and penalties (part of the prepetition priority claim); $292.00 representing the postpetition corporate franchise income tax due plus interest and penalties (part of the postpetition administrative expense claim)).

4. It is significant to note that the defendant-Department specifically disclaimed any averment that it was attempting to collect a "use" tax on the above-referenced transactions. *See Answers of the District of Columbia to Plaintiff's First Set of Interrogatories And Propounded Upon Defendant,* Question No. 23: "State all the facts upon which you rely to support your contention that the Plaintiffs owe sales and use tax to the Defendant. ANSWER: the District does not contend that use tax is owed."

5. Those purchase orders or invoices which specified a District of Columbia customer but had no shipping directions at all as well as those which contained the notation "to be picked up" were included by the auditing agent in the pool of transactions which were subject to taxation by the District of Columbia since the face of the invoice didn't adequately demonstrate that the merchandise was "actually picked up" by the customer. Moreover, the Department concedes that in such instances delivery into the District of Columbia was "presumed." *See* Defendant's Post–Trial Memorandum, at 12.

6. The auditing agent testified that even in those instances where the invoice which contained the name and address of a District of Columbia customer clearly indicated that a Virginia sales tax was collected, the transaction was still subject to an assessment by the District of Columbia.

According to the testimony of the auditing agent, the District of Columbia sales tax assessment in the instant case was premised upon an interpretation of various provisions of the District of Columbia Code which are more fully set forth and discussed herein.[7] The pivotal basis for the imposition of the aforementioned assessments for sales taxes under the applicable District of Columbia Code provision, according to the Department, was the fact that "title" of all goods shipped by the debtor by common carrier or otherwise transferred in the District of Columbia upon delivery to the place of destination. Accordingly, the Department argues, those interstate transactions are subject to the District of Columbia sales tax.

On May 6, 1992, the debtor filed a protest of the tax assessment with District of Columbia Department of Finance and Revenue Tax Compliance and Registration Division. The protest asserted that the taxes assessed against the debtor had no basis in fact or law. On June 18, 1992, an administrative hearing was conducted as a result of the protest whereupon factual evidence and legal argument was presented challenging the propriety of the tax assessment. The tax assessment was affirmed on July 27, 1992. No appeal from administrative ruling was permitted unless the debtor first paid the tax assessment. Accordingly, the debtor brought an adversary action pursuant to 11 U.S.C. § 505 in order to appeal the assessment of taxes on the interstate sales transactions.

## CONCLUSIONS OF LAW

### 1.

 It is uniformly recognized that a bankruptcy court has the jurisdiction and plenary authority under 11 U.S.C. § 505 to hear and determine the amount or legality of *any* unpaid tax claim whether or not the tax and its concomitant fines and penalties have been previously assessed or contested. *Starnes v. United States (In re Starnes)*, 159 B.R. 748, 749, 750 (Bankr.W.D.N.C.1993). The jurisdictional grant contained in § 505(a) is sufficiently broad enough to include the

determination or legality of any type of tax liability "whether or not paid" or previously adjudicated. Section 505 provides in part:

> (a)(1) Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine, or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

11 U.S.C. § 505(a)(1). The language of the aforementioned provision clearly indicates that a bankruptcy court's authority is discretionary or permissive rather than mandatory. *In re Galvano*, 116 B.R. 367, 372 (Bankr. E.D.N.Y.1990) (noting that § 505(a) provides that a court *may*, not *must*, determine a tax liability). Moreover, a fair reading of § 505(a) coupled with the policy objectives of the statutory provision leads to the inescapable conclusion that a debtor-in-possession such as Laptops is permitted under certain circumstances to prosecute a de novo appeal of unpaid taxes from an administrative body such as the District of Columbia Department of Finance and Revenue Tax Compliance and Registration Division in a bankruptcy forum. 3 *Collier on Bankruptcy* ¶ 505.04, at 505–23 (15th ed. 1993); *Boyle v. Wells (In re Gustav Schaefer Co.)*, 103 F.2d 237, 241 (6th Cir.), *cert. denied*, 308 U.S. 579, 60 S.Ct. 96, 84 L.Ed. 485 (1939) (opining that "courts have ruled with unanimity that the Bankruptcy Court is not irrevocably bound by an irrebuttable presumption of the validity and correctness of the assessment made by the taxing authorities."). *Cf. Perry v. District of Columbia*, 314 A.2d 766, 766 (D.C.), *cert. denied*, 419 U.S. 836, 95 S.Ct. 63, 42 L.Ed.2d 62 (1974) (noting that the jurisdictional prerequisite to a judicial review of a tax assessment under the law of the District of Columbia hinges upon the payment of the disputed tax assessment together with interest and penalties). The Fourth Circuit Court of Appeals has ruled that a bankruptcy court may even determine a debtor's tax liability, if any, irrespective of whether it had previously granted relief from the automatic stay

---

7. *See* D.C.Code Ann. § 47–2001 *et seq.* (1990 Supp.1993).

against a tax court proceeding on the same issue. *United States v. Wilson,* 974 F.2d 514, 517 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1352, 122 L.Ed.2d 733 (1993); *In re Swann Gasoline Co.,* 46 B.R. 640, 642 (Bankr.E.D.Pa.1985) (noting that even if relief from the automatic stay were afforded in order to permit a state court to make determinations of tax liability, such determinations would not have res judicata or collateral estoppel effect as to the bankruptcy court's own likely determination under § 505).

■ The limitation imposed upon a bankruptcy court's jurisdiction to determine the amount or legality of a tax claim and resolve tax disputes is set forth in § 505(a)(2), which provides in pertinent part:

> (2) The court may not so determine—
>
> (A) the amount or legality of a tax, fine, penalty, or addition to tax if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction *before the commencement of the case* under this title....

11 U.S.C. § 505(a)(2) (emphasis added). From the foregoing, it is abundantly clear that a bankruptcy court is not permitted to redetermine the merits of a tax claim or questions of tax liability "which have been contested *prepetition* in a state or federal or a quasi-judicial agency." *Northwest Beverage, Inc. v. Johnson (In re Northwest Beverage, Inc.),* 46 B.R. 631, 634 (Bankr.N.D.Ill. 1985) (emphasis added); *In re A.H. Robins Co. Inc.,* 126 B.R. 227, 228 (Bankr.E.D.Va. 1991); 2B Bankr.L.Ed. § 21:66, at 202 (1988).

■ Although the Chapter 11 debtor in the instant case appeared with counsel in an administrative hearing to contest the tax assessment and had an opportunity to present evidence and argument, both the initial assessment and the subsequent hearing which stemmed from a protest therefrom transpired postpetition. Accordingly, the jurisdictional limitation imposed by § 505(a)(2)(A) on this court's authority to resolve the tax dispute is inapplicable in the instant case and the issues in this controversy are therefore fully justiciable by this court.

**2.**

■ When a tax claim rooted in state law is contested, the bankruptcy court in deciding whether or not to allow or disallow a claim against the debtor's estate or determining the validity or legality of the assessment pursuant to § 505(a) must generally first pass on the applicability of the tax in accordance with the laws of the taxing sovereign. *Ravenna Industr., Inc., M.F. Co. v. Ohio Bureau of Workers' Compensation (In re A.C. Williams Co.),* 51 B.R. 496, 498 (Bankr. N.D.Ohio 1985) (citing with approval authority for the position that a bankruptcy court "must give full faith and credit to the state law upon which the tax is based."). *See Arkansas Corp. Comm'n v. Thompson,* 313 U.S. 132, 142, 61 S.Ct. 888, 891, 85 L.Ed. 1244 (1941); *Steinbrecher v. Toman (In re 168 Adams Bldg. Corp.),* 105 F.2d 704, 707 (7th Cir.1939), *cert. denied,* 308 U.S. 623, 60 S.Ct. 378, 84 L.Ed. 520 (1940); *Boyle v. Wells (In re Gustav Schaefer Co.),* 103 F.2d 237, 241 (6th Cir.), *cert. denied,* 308 U.S. 579, 60 S.Ct. 96, 84 L.Ed. 485 (1939).

Although this court does not purport, nor believe it is the function of a bankruptcy court in general, to sit as an overseer or supervisor of the manner in which a taxing authority conducts its audits or makes its assessments, this court as a court of equity cannot help but comment at the outset upon the seemingly callous and lackadaisical manner in which the taxes were assessed in this case. The Department's auditing agent in this matter ostensibly had no regard for whether or not a tax had been previously collected and paid to another jurisdiction, seemed to make short-work of the entire process in most instances by merely locating those purchase orders or invoices which depicted an address belonging to a resident of the District of Columbia and assessing taxes on those transactions even in instances where there was at least some intimation, if not a clear indication, that the merchandise was actually picked up by the customer in Virginia. Even a number of interstate sales transactions to ostensibly tax-exempt governmental organizations such as the Department of Commerce did not escape the grasp of the auditing agent's calculator. *See generally*

D.C.Code Ann. § 47–2005(1) & (2) (1990) (setting forth the exemption from sales taxation of sales to governmental instrumentalities). The cavalier manner in which the assessment was conducted can perhaps be best exemplified by the fact that in many instances the debtor could not even identify a great number of transactions subject to the tax assessment at all due to errors in the Department's records and in those that were ascertainable therefrom, approximately two hundred and fifty (250) errors were found.[8] Furthermore, the Department presented virtually no competent evidence which provided the basis for, much less substantiates, its assessment of franchise income taxes.

The starting point for determining applicability of the District of Columbia sales tax upon an out-of-state vendor such as Laptops for those aforementioned interstate transactions out of necessity must begin with the express language of the applicable statutory provisions contained in the jurisdiction's tax code upon which the sales taxes are based. It is, however, significant to note that the District of Columbia sales tax is patterned after state sales tax laws and its taxing power is limited in the same manner that the authority of a state to tax is limited. *United States v. District of Columbia,* 669 F.2d 738, 746 (D.C.Cir.1981) (noting that the legislative history made it clear that "Congress intended to place the District [of Columbia] on an equal footing with the states.").

Chapter 20 of the D.C.Code provides the basis for imposing a "Gross Sales Tax". Specifically, § 47–2002 provides:

A tax is imposed upon all vendors for the privilege of *selling at retail* certain selected services (*defined as "retail sale" and "sale at retail" in this chapter* ). The rate of such tax shall be 6 per centum of the gross receipts from *sales* of or charges for such tangible personal property ...

D.C.Code Ann. § 47–2002 (1990) (emphasis added). The susceptibility of a given transaction to sales taxation under the D.C.Code hinges in part upon the construction of the definitional provisions which naturally flow from aforementioned statute. Under the D.C.Code, a " '[r]etail sale' and 'sale at retail' means the *sale* in any quantity or quantities of any tangible personal property or service taxable under the terms of this chapter. Said term shall mean all *sales* of tangible personal property for any purpose other than [resale]. . . ." D.C.Code Ann. § 47–2001(n)(1) (Supp.1993) (emphasis added). Included in the term "retail sale" and "sale at retail" are rental and repair transactions. D.C.Code Ann. § 47–2001(n)(1)(F) & (I) (1990). It is significant to note that also interwoven into the definitional fabric of the aforementioned statutory provisions is the definition of a "sale" or "selling" which is defined in part as:

*[A]ny transaction whereby title or possession, or both of tangible personal property is or is to be transferred by any means whatsoever,* including rental, lease, license, or right to reproduce or use, for a consideration, by a vendor to a purchaser, or any transaction whereby services subject to tax under this chapter are rendered for consideration or are sold to any purchaser by any vendor, *and shall include, but not be limited to, any "sale at retail" as defined in this chapter.*

D.C.Code Ann. § 47–2001(q) (1990) (emphasis added).

The Department in the instant case vehemently asserts, among other things, that the aforementioned provisions provide the statutory basis for the sales tax assessment. The Department contends, and the debtor does not dispute with respect to the majority of transactions, that both title and possession on the assessed sales simultaneously passed within the borders of the District of Columbia upon delivery to the place of destination. Absent a different intention by the parties, the Department's assertion comports with the general rule. As such, the "sale" both under the aforementioned statutory provi-

---

**8.** In an effort to avoid the necessity of independently auditing the individual transactions, this court will assume for the basis of legal and factual analysis as applicable to the underlying theories in this matter with respect to the "sales" tax assessment only, that the audit was properly performed and that all of the subject sales transactions were delivered into the District of Columbia and not otherwise exempt.

sions and in accordance with general commercial standards transpired in the District of Columbia. *See* U.C.C. §§ 2–401(2), 2–106(1); D.C.Code Ann. §§ 28:2–401(2), 28:2–106(1) (1993); Md. Commercial Law Code Ann. §§ 2–401(2), 2–106(1) (1993); Va.Code Ann. §§ 8.2–401(2), 8.2–106(1) (Michie 1993); *See also Sullivan v. United States,* 395 U.S. 169, 174, 89 S.Ct. 1648, 1651, 23 L.Ed.2d 182 (1969) (noting that the incidence of a sales tax is the transfer of title for consideration); *Community Telecasting Serv. v. Johnson,* 220 A.2d 500, 503–04 (Me.1966). The Department contends that since it is the "sale" that is the taxable event, the transactions in this case are within the purview of the statutory provisions which subject vendors to liability for a sales tax. This assertion is consistent with the initial and most manifest attribute of a sales tax which is the taxable event which triggers its payment—the "sale." *Montgomery County v. Maryland Soft Drink Ass'n, Inc.,* 281 Md. 116, 377 A.2d 486, 491 (1977); *John McShain, Inc. v. District of Columbia,* 205 F.2d 882, 883 (D.C.Cir.), *cert. denied,* 346 U.S. 900, 74 S.Ct. 227, 98 L.Ed. 400 (1953) (noting that the "purchase" is the event upon which a sales tax is imposed); *accord Central Credit Union v. Comptroller of the Treasury,* 243 Md. 175, 220 A.2d 568, 572 (1966).

■ The plaintiffs in this proceeding retort in part by arguing that a definitional prerequisite integral to the imposition of a sales tax specifically excludes the interstate transactions such as those in the instant case. Specifically, the plaintiffs note that pursuant to the statutory definition, a "retail sale" or "sale at retail" does not include:

Any sale in which the only transaction in the District is the mere execution of the contract of sale and in which the tangible personal property sold is not in the District at the time of such execution: Provided, however, that nothing contained in this subsection shall be construed to be an exemption from the tax imposed under Chapter 22 [ (the "Use Tax" provision) ] of this title....

D.C.Code Ann. § 47–2001(n)(2)(C) (1990). The plaintiffs give this provision an expansive and unduly parsimonious reading and, in doing so, aver that this provision exempts interstate transactions whereby goods are delivered from outside the jurisdiction into the District of Columbia pursuant to a previously executed contract. The plaintiffs' view is not sustainable. Although reported authority interpreting the aforementioned statutory provision is either nonexistent or appears scant, this court cannot give it the broad reading that the plaintiffs suggest. To do so, would seem to ignore the plain meaning of the provision and would be inconsistent with the notion that exemptions from taxation should be narrowly construed in favor of the taxing sovereign and that any expressed intention with respect to the commutation of a tax must be entirely clear from the language of the statute itself. In this case, the contracts were not executed in the District of Columbia and delivery of merchandise into the jurisdiction is seemingly sufficient enough to place the interstate sales transactions in the instant case beyond the meaning of the provision.

■ Although the provisions of the D.C.Code are less than clear on the treatment of "sales" taxes on interstate sales such as those in the instant case, the District of Columbia Municipal Regulations, which must be viewed in tandem with the D.C.Code, provide guidance and indeed give recognition to the fact that certain interstate sales transactions are not appropriate for sales taxation. Illustrative of this point is the very first regulatory provision which provides:

The D.C. Sales Tax Act (D.C.Code, § 47–2001, *et seq.*), as amended which is referred to in this chapter as the "Act", imposes a tax upon every vendor *in the District* selling certain tangible personal property at retail and selling certain selected services defined as selling at retail.

D.C.Mun.Regs. tit. 9, § 400.1 (1986) (emphasis added). *See id.* § 404.1 to § 404.7. A fair reading of the quoted regulation seems to connote a requirement of a vendor's "physical presence" within the District Columbia as a prerequisite to the imposition of a "sales" tax. Such a reading would be consistent with the recent United States Supreme Court decision of *Quill Corp. v. North Dakota,* —— U.S. ——, 112 S.Ct. 1904, 119

L.Ed.2d 91 (1992), which reaffirmed the previously articulated conclusion that the Commerce Clause of the United States Constitution required a vendor's "physical presence" in the taxing jurisdiction as a fundamental prerequisite to the sovereign's ability to tax interstate sales.

### 3.

 Although the Department through argument and its papers expressly disclaims any entitlement to, or that the assessment was based upon, "use" taxes, a critical distinction between "sales" taxes and "use" taxes must be made at this juncture. While both compensating taxes are generally considered privilege or excise taxes, the two taxes, although imposed by the same act and often yielding an identical result, are distinct and "different in conception" since they are "assessed upon different transactions". *McLeod v. J.E. Dilworth Co.*, 322 U.S. 327, 330, 64 S.Ct. 1023, 1025, 88 L.Ed. 1304 (1944). "A sales tax is a tax on the freedom of purchase ..." where a "use tax is a tax on the enjoyment of that which was purchased." *McLeod*, 322 U.S. at 330, 64 S.Ct. at 1026. *See, e.g.*, D.C.Code Ann. § 47–2201 *et seq.* (1990 & Supp.1993) (setting forth the statutory provision for "use" taxes). The two taxes are generally promulgated by legislatures to form an integrated whole and are thus complimentary. *Miller Bros. Co. v. State of Maryland*, 347 U.S. 340, 343, 74 S.Ct. 535, 538, 98 L.Ed. 744 (1954), *reh'g denied*, 347 U.S. 964, 74 S.Ct. 708, 98 L.Ed. 1106 (1954); 68 Am.Jur.2d *Sales and Use Tax* § 189 (1993). A "use" tax is supplemental to a sales tax and one of its principal purposes is to prevent an evasion of the sales tax. *See National Geographic Soc'y v. California Bd. of Equalization*, 430 U.S. 551, 555, 97 S.Ct. 1386, 1389, 51 L.Ed.2d 631 (1977). *See also Williams v. Vermont*, 472 U.S. 14, 24, 105 S.Ct. 2465, 2472, 86 L.Ed.2d 11 (1985). As noted by a leading commentator in the area of taxation when discussing the historical development of sales and use taxes in conjunction with constitutional concerns:

> The use tax has had its principal development as complementing the sales tax; it is used to fill gaps where the States could not constitutionally impose a sales tax on inter-state arrival of goods. By subjecting to the use tax goods not reachable by the sales tax, by reason of their out-of-state origin, the use tax was thus designed to complement the sales tax.
>
> * * * * * *
>
> From the outset, it was recognized that interstate sales presented special constitutional problems. Interstate sales move in two directions—goods are shipped out of the selling State, and goods are moved into the State. While there was no case squarely on point with respect to the power of a State to impose a tax on either type of sale, it had been taken for granted by the Supreme Court before the middle of the 1930's that a sales tax, especially on goods shipped into a State to fill an order, would run afoul of the commerce clause.
>
> Consequently, when the States began using the sales tax in the early 1930's, it was assumed that a very difficult aspect of the tax would be the treatment of interstate sales, since the sales tax could not be applied to interstate transactions. To handle this problem, the States turned to the use tax, which would be used as a companion levy of the sales tax.
>
> * * * * * *
>
> Generally speaking, a sale is attributable to its destination. Where the destination is within the same State as its origin, the tax is referred to as a sales tax. If it is an interstate transaction, the tax will be designated some form of use tax.

Paul J. Hartman, Federal Limitations on State and Local Taxation § 10:1, at 578–80 (1981) (footnotes omitted).

 Although it has been long ago noted that the power to levy taxes is an inherent attribute of sovereignty, sales not within the taxing power of a sovereign under the United States Constitution are expressly exempted from sales tax statutes which impose such taxes. *See* D.C.Code Ann. § 47–2005(12) (1990). Stated differently, it is a fundamental notion that the power of taxation must be exercised subject to the requirements and restrictions of the United States Constitution. It is well-settled that taxation

of a foreign corporation's intrastate business activities must proceed along such a path as not to unduly infringe upon the Due Process Clause or the Commerce Clause of the United States Constitution. Hence, the propriety of the sales tax assessments on the interstate sales transactions in the instant case must out of necessity be ascertained within the framework of specific constitutional standards.

Unlike typical over-the-counter intrastate sales, interstate sales transactions frequently trigger federal constitutional problems. The United States Supreme Court has noted that decisions in this area of taxation are by no means consistent or readily reconcilable, *Miller Bros. Co. v. State of Maryland*, 347 U.S. 340, 344, 345, 74 S.Ct. 535, 538, 539, 98 L.Ed. 744 (1954), *reh'g denied*, 347 U.S. 964, 74 S.Ct. 708, 98 L.Ed. 1106 (1954), and has early on appropriately termed the doctrinal analysis associated with state taxation of interstate commerce to be a "quagmire." *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458, 79 S.Ct. 357, 362, 3 L.Ed.2d 421 (1959). It is primarily due to the diverse nature of interstate activities that make line drawing between what is constitutionally permissible and what is not, difficult. *See United Air Lines, Inc. v. Mahin*, 410 U.S. 623, 629, 93 S.Ct. 1186, 1191, 35 L.Ed.2d 545 (1973).

■■■ The point at which title or possession transfers is not necessarily determinative as to whether a sale was an interstate or intrastate transaction. *Nudelman v. Globe Varnish Co. (In re Globe Varnish Co.)*, 114 F.2d 916, 918 (7th Cir.1940), *cert. denied*, 312 U.S. 690, 61 S.Ct. 621, 85 L.Ed. 1126 (1941). Since the indispensable element of interstate commerce is the importation of goods into one jurisdiction from another, there can be no real question that the transactions in the instant case are interstate sales transactions. *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 255–56, 85 S.Ct. 348, 356–57, 13 L.Ed.2d 258 (1964). It is, nevertheless, significant to note that "visible territorial boundaries do not always establish the limits of a state's taxing power or jurisdiction.... If there is some jurisdictional fact or event to serve as a conductor, the

reach of the state's taxing power may be carried to objects of taxation beyond its borders." *Miller Bros. Co. v. State of Maryland*, 347 U.S. 340, 342–343, 74 S.Ct. 535, 537–38, 98 L.Ed. 744 (1954), *reh'g denied*, 347 U.S. 964, 74 S.Ct. 708, 98 L.Ed. 1106 (1954). The Supreme Court has consistently opined that "interstate commerce may be made to pay its own way". *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 281, 97 S.Ct. 1076, 1080, 51 L.Ed.2d 326 (1977), *reh'g denied*, 430 U.S. 976, 97 S.Ct. 1669, 52 L.Ed.2d 371 (1977). However, the most fundamental precondition on a sovereign's power to impose a tax upon an out-of-state seller for interstate transactions is that the specific statute and the application thereof satisfy through a dual, rather than an intermingled, analysis Due Process and Commerce Clause concerns. *Quill Corp. v. North Dakota*, —— U.S. ——, ——, 112 S.Ct. 1904, 1909, 119 L.Ed.2d 91 (1992). Thus, when analyzing the constitutionality of a tax such as the sales tax assessed in the case at bar, it is incumbent upon a court to recognize the "analytically distinct" requirements that the Due Process and Commerce Clauses mandate. *See id.* As the United States Supreme Court has recently noted, Due Process and Commerce Clauses differ fundamentally and "pose distinct limits on the taxing powers of the States" even though the two claims overlap and are closely related. *Id.* The Court in *Quill* stated that:

> '[T]hough overlapping, the two conceptions are not identical. There may be more than sufficient factual connections, with economic and legal effects, between the transaction and the taxing state to sustain the tax as against due process objections. Yet it may fall because of its burdening effect upon the commerce.'

*Id.* (quoting *International Harvester v. Department of Treasury*, 322 U.S. 340, 353, 64 S.Ct. 1019, 1032–1033, 88 L.Ed. 1313 (1944)).

4.

■■■ In determining whether a sovereign's tax comports with constitutional due process requirements, the controlling question is resolved in conjunction with "one time-honored concept: that due process re-

quires some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." *Miller Bros. Co. v. State of Maryland,* 347 U.S. 340, 344–45, 74 S.Ct. 535, 538–39, 98 L.Ed. 744 (1954), *reh'g denied,* 347 U.S. 964, 74 S.Ct. 708, 98 L.Ed. 1106 (1954); *Quill,* —— U.S. at ——, 112 S.Ct. at 1909. Further, the "income attributed to the State for tax purposes must be rationally related to 'values connected with the taxing state.' " *Quill,* —— U.S. at ——, 112 S.Ct. at 1909–10 (quoting in part *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 273, 98 S.Ct. 2340, 2344, 57 L.Ed.2d 197 (1978)).

■■■ The United States Supreme Court in the landmark case of *Quill Corp. v. North Dakota,* —— U.S. ——, 112 S.Ct. 1904 (1992), opined that the central concern of due process is the fundamental fairness of the governmental activity upon an individual. *Quill,* —— U.S. at ——, 112 S.Ct. at 1913. Consequently, "the due process nexus analysis requires that we ask whether an individual's connections with a State are substantial enough to legitimate the State's exercise of power over him." *Id.* The Court stated that the requirements of "notice" and "fair warning" were "the analytic touchstone of due process nexus analysis." *Id.* The notice and fairness concerns animating the due process nexus inquiry led the Court in *Quill,* after an assessment of the evolution of due process jurisprudence, to expressly abandon its previously articulated "physical presence" requirement as set forth in *National Bellas Hess, Inc. v. Department of Revenue,* 386 U.S. 753, 758, 87 S.Ct. 1389, 1392, 18 L.Ed.2d 505 (1967), *overruled in part by, Quill Corp. v. North Dakota,* —— U.S. ——, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992), in favor a "minimum contacts" standard imported from seminal case law in the area of judicial jurisdiction.[9] *Quill,* —— U.S. at ——, 112 S.Ct. at

1910. In framing the inquiry for purposes of the due process nexus requirement only, the Court opined that the focus is on whether an out-of-state vendor had "minimum contacts" with the taxing sovereign " 'such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' " *Id.* (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). The "minimum contacts" test, as can be gleaned from aforementioned "notice" and "fair warning" requirements, can ostensibly be translated into a "reasonableness" and "foreseeability" inquiry: "The thrust of the 'minimum contacts' test is whether a corporation has sufficient contacts with the state so that requiring the corporation to defend the particular suit in that state's court system is reasonable." Daniel L. Gaustad, Comment, *Constitutional Law—Implications of the Due Process Clause and the Commerce Clause When Imposing State Use–Tax Collection on Out-of-State Sellers: Settled Expectations?,* 69 N.D.L.Rev. 445, 450 (1993); *see Quill,* —— U.S. at ——, 112 S.Ct. at 1911 (quoting Justice Stevens' concurrence in *Shaffer v. Heitner,* 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977)).

■■■ As the plaintiffs' readily acknowledge, satisfying the "minimum contacts" requirement for due process is not an onerous burden.[10] Although certainly not to the same extent as vendor in *Quill,* the debtor in this case "purposefully directed its activities" at District of Columbia residents. It has advertised in local newspapers and for a period of time maintained an advertisement in the District of Columbia Yellow Pages. Laptops delivered a relatively substantial amount goods into the jurisdiction and on occasion, albeit rare, its agents accompanied the delivery of its products in the taxing jurisdiction to the place of destination inci-

9. In abandoning the more formalistic tests which focused on a party's "physical presence" and in support of its flexible "minimum contacts" formulation for due process nexus analysis, the *Quill* Court relied in part upon the landmark decisions of *International Shoe Co. v. Washington* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), and *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85

L.Ed.2d 528 (1985). *See Quill Corp. v. North Dakota,* —— U.S. ——, ————, 112 S.Ct. 1904, 1910–11, 119 L.Ed.2d 91 (1992).

10. "Plaintiffs acknowledge that the minimum contacts necessary to satisfy Due Process is an easy standard to satisfy." Plaintiffs' Post–Trial Memorandum, at 20 n. 12.

dent to the contract for sale. This was done, at least in part, for customer relations purposes. The debtor's activity or contacts within the District of Columbia are sufficient to satisfy the "notice" and "reasonableness" requirements for due process purposes. Accordingly, the Due Process Clause is not a barrier to the enforcement of the District of Columbia sales tax assessment in the instant case.

### 5.

■ The benchmark against which states may be permitted to tax interstate commerce without unduly impinging upon the Commerce Clause is dependent upon the satisfaction of all of the prongs contained in a four-part test promulgated by the United States Supreme Court in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326 (1977), *reh'g denied*, 430 U.S. 976, 97 S.Ct. 1669, 52 L.Ed.2d 371 (1977). Under *Complete Auto Transit*, a tax will survive a Commerce Clause challenge if:

■ the tax is applied to an activity with a *substantial nexus* with the taxing state,

■ is fairly apportioned,

■ does not discriminate against interstate commerce,

■ and is fairly related to the service provided by the State.

*Id.* (quoted with approval in *Quill Corp. v. North Dakota*, — U.S. —, —, 112 S.Ct. 1904, 1912, 119 L.Ed.2d 91 (1992)) (emphasis added).

■ In contrast to the Due Process Clause nexus inquiry which centers on the fundamental fairness of the governmental activity upon the "individual," the Commerce Clause and its nexus requirement focuses on "the effects of state regulation on the national economy." *Quill Corp. v. North Dakota*, — U.S. —, —, 112 S.Ct. 1904, 1913, 119 L.Ed.2d 91 (1992). *See National Bellas Hess, Inc. v. Department of Revenue*, 386 U.S. 753, 760, 87 S.Ct. 1389, 1393, 18 L.Ed.2d 505 (1967), *overruled in part by, Quill Corp. v. North Dakota*, — U.S. —, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992) (noting that "[t]he very purpose of the Commerce Clause

was to ensure a national economy free from . . . unjustified local entanglements."). In light of the differing constitutional concerns that the two Clauses signify, the Court in *Quill*, despite the similarity in phrasing, expressly rejected the contention advanced by the taxing authority that the "minimum contacts" nexus requirement of the Due Process Clause and "substantial nexus" requirement under the Commerce Clause were equivalent. *Id.*

The Court found that "substantial nexus" prong of *Complete Auto Transit* required something more than "minimum contacts" before a sovereign can interfere with interstate commerce by exercising its taxing power over out-of-state vendors. The justices opined that unlike the due process "minimum contacts" nexus analysis, the "substantial nexus" requirement for Commerce Clause purposes is not "a proxy for notice," but instead a means of limiting the burdens which a sovereign may impose upon interstate commerce. *Quill*, — U.S. at —, 112 S.Ct. at 1913. In assessing the "substantial nexus" requirement, the Court in *Quill* reaffirmed "*a bright-line rule in the area of sales and use taxes*" which mandates a rule of a higher or more restrictive constitutional threshold of "*physical presence*" in order for state taxation schemes to satisfy Commerce Clause concerns. *Id.* at —, 112 S.Ct. at 1914–16 (emphasis added). *Cf. Quotron Sys., Inc. v. Comptroller of the Treasury*, 287 Md. 178, 411 A.2d 439, 443 (1980) (noting that since sales and use taxes are complimentary, the same standards for their imposition are applicable). In reaffirming the bright-line "physical presence" requirement for "substantial nexus" in regard to the Commerce Clause analysis, the *Quill* majority readily acknowledged that certain vendors engaging in interstate sales are essentially free from the duty to collect sales and use taxes:

[T]he bright-line rule of *Bellas Hess* further the ends of the dormant Commerce Clause. Undue burdens on interstate commerce may be avoided not only by a case-by-case evaluation of the actual burdens imposed by particular regulations or taxes, but also, in some situations, by the demarcation of a discrete realm of commercial activity that is free from interstate

taxation. *Bellas Hess* followed the latter approach and *created a safe harbor for vendors "whose only connection with customers in the [taxing] State is by common carrier or the United States mail."*

Like other bright-line tests, the *Bellas Hess* rule appears artificial at its edges: whether or not a State may compel a vendor to collect a *sales or use tax* may turn on the presence in the taxing State of a small sales force, plant, or office. This artificiality, however, is more than offset by the benefits of a clear rule. *Such a rule firmly establishes the boundaries of legitimate state authority to impose a duty to collect sales and use taxes and reduces litigation concerning those taxes.*
*Quill,* —— U.S. at ——, 112 S.Ct. at 1914 (citations & footnotes omitted) (emphasis added).

Although the boundaries of what range of commercial activity constitutes a "physical presence" for purposes of the "substantial nexus" requirement of the Commerce Clause are not drawn with precision, it is, however, clear that a "slightest presence" standard as well as an "economic presence" for constitutional nexus has been expressly rejected by the Supreme Court. *See Quill,* —— U.S. at ——, 112 S.Ct. at 1914 n. 8; *National Geographic Soc'y v. California Bd. of Equalization,* 430 U.S. 551, 556, 97 S.Ct. 1386, 1390, 51 L.Ed.2d 631 (1977). Further, there is authority for the position that the nexus requirements necessary to pass constitutional muster are greater with respect to "sales" taxes than with respect to "use" taxes. *See Rowe–Genereux, Inc. v. Vermont Dept. of Taxes,* 138 Vt. 130, 411 A.2d 1345, 1349, 1350 (1980). *See also* Paul J. Hartman, *Collection of the Use Tax on Out-of-State Mail–Order Sales,* 39 Vand.L.Rev. 993 (1986). The case at bar does not, however, turn on such refinements in the law.

■ In light of the decision in *Quill* and, *inter alia,* a careful examination of the authority set forth above, the conclusion in this case is inescapable. Admittedly, Laptops attempted to avail itself of the District of Columbia market by engaging in occasional advertising in the Washington Post and the Yellow Pages. There is, however, a wide gulf between this sort of activity and an aggressive, continuous and systematic solicitation that the corporation in *Quill* had engaged. The only "physical" link between the vendor and the taxing jurisdiction in this case was the rare non-recurring instances when the debtor's agent would accompany a common carrier into the jurisdiction. The evidence in this case made it abundantly clear that these instances were aberrations from normal practice and while this degree of activity was sufficient to satisfy the "minimum contacts" requirement of the Due Process Clause, they were insufficient to satisfy the "substantial nexus" requirement of the Commerce Clause.

■ The contracts for sale between Laptops and its customers were entered into in Virginia with the deliveries to the purchasers at their place of destination via common carrier being made in accordance with the terms of sale. As such, interstate delivery was a contemplated and necessary incident to the sale from the birth of each commercial relationship rather than merely incidental to it. The sales in this case were so intimately connected with the delivery as to be in substance and effect part and parcel thereof. The fact that under commercial standards that it is the transfer of "title" which generally determines the occurrence of the "sale" and title transferred with respect to the vast majority of transactions in this case upon delivery to the point of destination in the District of Columbia, while relevant, cannot alone be determinative for purposes of the Commerce Clause. To hold otherwise, would essentially render the *Quill* decision and Commerce Clause considerations meaningless since commercial reality dictates that title virtually always transfers on interstate transactions upon the delivery to the point of destination.

■ Justice White, concurring in part and dissenting in part, criticized the majority's logic and rationale in justifying the "physical presence" rule because it perpetuates a rule that creates an unfair "interstate tax shelter" and "physical presence frequently has very little to do with the transaction a State might seek to tax." *Quill,* —— U.S. at

——, 112 S.Ct. at 1920 & 1921 (White, J., concurring in part and dissenting in part). The *Quill* majority seemed to in fact reject a view which centers on the transfer of title despite arguments raised by the Justice White in his sole dissent.[11] It is clear that the mere passage of title within the taxing jurisdiction cannot alone translate into a "substantial nexus" or be considered tantamount to the satisfaction of the "bright-line rule" of "physical presence" as articulated in *Quill.*

■■■ For the foregoing reasons, this court finds that the debtor lacked the "substantial nexus" required under the Commerce Clause for the imposition of the sales tax assessment in this case. Thus, the District of Columbia's sales tax, as applied to Laptops, is an unconstitutional burden on interstate commerce and, accordingly, a violation of the Commerce Clause of the United States Constitution.

### 6.

■■■ Pursuant to Federal Rule of Bankruptcy Procedure 3001(f) and 11 U.S.C. § 502(a), a proof of claim executed and filed in accordance with § 501 and with applicable implementation by the Bankruptcy Rules constitutes *prima facie* evidence of the amount and validity of the claim. *In re Saunders,* 159 B.R. 482, 484 (Bankr.W.D.Va. 1993). Generally upon objection to the claim coupled with the admission of probative evidence which tends to sufficiently rebut the *prima facie* validity of the claim, the burden shifts to the claimant who has the ultimate burden of persuasion as to the validity of its claim. *Id. See C–4 Media Cable South, L.P. v. Reds T.V. & Cable, Inc. (In re C–4 Media Cable South, L.P.),* 150 B.R. 374, 376 (Bankr. E.D.Va.1992); 3 *Collier on Bankruptcy* ¶ 502.01, at 502–16–17 (1993). In forums other than a bankruptcy court, however, the burden of persuasion as to the lack of validity

of a taxing sovereign's claim generally falls upon the taxpayer. Elmer Dean Martin III, *Burden of Persuasion: The Overlooked Defense to Tax Claims,* 21 Cal.Bankr.J. 117, 117 (1993). *See, e.g.,* D.C.Code Ann. § 47–2010 (1990) (providing for a "presumption" of taxability and allocating the burden to the vendor to prove that a receipt is not subject to sales taxation). Consequently, a conflict often arises which requires the bankruptcy court to determine whether the claims of the taxing authority:

> are to be treated like all other claims, and accordingly whether the tax authorities must bear the ultimate burden of persuasion that they have valid claims, or whether the debtor, debtor in possession, or trustee must bear the burden of persuading the court that the tax authority does not have a valid claim.

Martin, *supra,* at 117. Despite the existence of authority to the contrary in other jurisdictions, the Court of Appeals for the Fourth Circuit recently held that the burden of proof rules and concomitant presumptions which would be applicable in a nonbankruptcy arena were equally applicable in a bankruptcy forum.

In light of the aforementioned standard with respect to tax claims in the Fourth Circuit, the plaintiffs in the case at bar have clearly sustained their burden of proof and established by competent evidence and appropriate legal authority that the factual and legal basis did not support the District of Columbia assessment of **EITHER** the sales taxes or the franchise income taxes together with penalties and interest.

### 7.

Consistent with this opinion and for reasons stated, it is hereby **ORDERED, ADJUDGED, AND DECREED** that the assessment against Laptops Etc. Corporation and Edward Dow personally by the District of

---

**11.** The fact that the out-of-state vendor in *Quill* held title to a number of floppy diskettes that it licensed to customers in the taxing jurisdiction, solicited business through catalogs and flyers which were directly mailed to a substantial number of customers in the taxing jurisdiction, advertised nationally, earned nearly $1,000,000 from customers in the taxing jurisdiction, mailed merchandise by common carrier into the taxing jurisdiction combined with the fact that *"title passed to the purchaser when the merchandise was received"* in the taxing jurisdiction was insufficient to constitute a "substantial nexus" for purposes of the Commerce Clause. *See Quill Corp. v. North Dakota,* —— U.S. ——, ——, ——, ——, 112 S.Ct. 1904, 1907, 1907 n. 1 & 1908, 119 L.Ed.2d 91 (1992) (emphasis added).

Columbia Department of Finance and Revenue and subsequent affirmance thereof by District of Columbia Department of Revenue Tax Compliance and Revenue Division is without force or effect with judgment being entered accordingly.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the debtor's amended objection to the prepetition priority and postpetition administrative tax claims filed by the District of Columbia in the amounts of $85,593.99 and $39,811.15 respectively is in all things SUSTAINED. Accordingly, the aforementioned claims are DISALLOWED in their entirety.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**